[No. H004292. Sixth Dist. Aug. 14, 1989.]

In re CORIENNA G. et al., Persons Coming Under the Juvenile Court Law.
SANTA CLARA COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v.
KIRK G. et al., Defendants and Appellants.

COUNSEL

S. Clay Bedford and Mary G. Swift, under appointments by the Court of Appeal, for Defendants and Appellants.

Donald L. Clark, County Counsel, Diane L. Bennett and Jamie Jacobs-May, Deputy County Counsel, for Plaintiff and Respondent.

Leo Himmelsbach, District Attorney, and Robert J. Masterson, Deputy District Attorney, for Minors.

OPINION

ELIA, J.—Appellants Mary and Kirk G. appeal from an order of the juvenile court following a contested permanency planning hearing. The court ordered that the permanent plan for appellants' children, Corienna and Sean G., should be for long-term foster care or relative placement. Appellants allege that at this hearing the court erred in denying them further reunification services, failed to consider placing the children with relatives, and failed to make a finding of the probability that the children would be returned to their parents' custody within six months. Although the court failed to make this latter determination expressly, we conclude it can be implied from the record. Since we find no other error, we will affirm the trial court's order.

### FACTUAL BACKGROUND

Corienna and Sean, then aged four and one-and-a-half, were first taken into protective custody on April 26, 1985, in Solano County in response to allegations that they had been neglected and that Corienna had been sexually abused. An amended petition was filed on May 19, 1985, alleging that the children came within the provisions of Welfare and Institutions Code section 300, subdivisions (a) and (d). The petition was sustained at a jurisdictional hearing on November 26, 1985.

The case was then transferred to Santa Clara County, where appellants resided, and a dispositional hearing was held on January 24, 1986. Following this hearing, the court ordered that the children remain in out-of-home placement, that no-contact orders with the father remain in effect, that appellants attend parenting classes and therapy relating to sexual abuse, and that there be regular visitation with the children and no discussion of the

sexual abuse with them. These orders became the basis of a reunification service plan which was signed by appellants on February 3, 1986.

A six-month review hearing was held on June 19, 1986. The social report submitted for this hearing indicated poor progress towards reunification. Appellants had dropped out of parenting classes and had no stable housing; although they were attending counseling they continued to deny the sexual molest allegations. The court orders following this hearing continued the status quo and added requirements for financial counseling and establishment of appropriate housing.

A 12-month review and permanency planning hearing was held on December 1, 1986. The social report submitted for this hearing reported some progress toward reunification. The father had been allowed supervised visitation beginning in November, 1986, following a psychological evaluation. Appellants had secured appropriate housing, had attended eight parenting classes, and visits with the children had gone well. Appellants continued to deny molest allegations, however, and had been terminated from sexual abuse counseling for this reason. The report recommended that reunification services be extended for an additional six months, but concluded that the "objectives" section of the reunification service plan should be revised to require "appropriate parenting behaviors, as evidenced by an adequate budget, consistent employment, regular visitation, adequate medical care, appropriate nutritional knowledge."

A second permanency planning hearing was initially scheduled for May 18, 1987. The social report submitted for this hearing reported continued progress towards reunification, and contained a recommendation that the children be returned to parental custody at the end of the school year, with continued departmental supervision. By the hearing date, however, the social worker had changed her recommendation, and decided that the children should not be returned home. She testified at a later hearing that she advised appellants of her revised recommendation, and that the case would be set for trial. The hearing was continued to June 9 for trial setting, but did not take place because appellants took the children to Utah without permission.

The social worker also testified that on September 28, 1987, she submitted a further report changing her recommendation, based both on the abduction and on information from the Solano County file documenting the sexual abuse allegations against the father, the unsuccessful services offered appellants, and the mother's limited cognitive abilities.

A contested permanency planning hearing finally took place on February 3 and 4, 1988, with the social worker recommending long-term foster care

or relative placement as the permanent plan for the children. At the conclusion of this hearing, the court expressed its concern that the father had never been directly confronted with the fact that the allegations that he had sexually abused Corienna had been sustained in the Solano County jurisdictional hearing. The court continued the case for 30 days, and ordered that in the interim the mother submit to a neurological examination, the father be evaluated by a psychologist with a view toward determining the possibility of his admitting the sexual abuse allegations, and the department of social services evaluate all possible relative placements.

A continued hearing was held on March 7, 1988. The court reviewed the reports submitted for this hearing, and at its conclusion ruled that it would be seriously detrimental to return the children to appellants, and that the children continue under department care in a suitable relative or foster home pending a more permanent placement. This appeal ensued.

## DISCUSSION

As an initial matter, appellants argue that an order making a permanent plan for children to remain in long-term foster care is an appealable order. Respondent county counsel agrees that it is. We are authorized to examine this question, however, since a court always has jurisdiction to determine its own jurisdiction (2 Witkin, Cal. Procedure (3d ed. 1985) § 273 at p. 675) regardless of whether the question is raised by the litigants. (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 302-303 [109 P.2d 942, 132 A.L.R. 715].)

Several different dispositional orders may result from a permanency planning hearing. (See Welf. & Inst. Code, § 366.25, subd. (d)(2).) If a court finds a child likely to be adopted, absent certain exceptions, it can order the case referred to county counsel for the commencement of proceedings to terminate parental rights. This order is sometimes called a "reference" order. (Welf. & Inst. Code, § 366.25, subd. (d)(1).) If a child is unlikely to be adopted, or if one of the previous exceptions applies, the court is to order the initiation of legal guardianship proceedings or, as in this case, long-term foster care. Although there has been substantial disagreement among the appellate courts of this state as to whether a "reference" order is appealable (see, e.g., *In re Joshua S.* (1986) 186 Cal.App.3d 147, 149-155 [230 Cal.Rptr. 437]; *In re Lorenzo T.* (1987) 190 Cal.App.3d 888 [235 Cal.Rptr. 680]; *In re Sarah F.* (1987) 191 Cal.App.3d 398 [236 Cal.Rptr. 480]; *In re Linda P.* (1987) 195 Cal.App.3d 99 [240 Cal.Rptr. 474] [such orders appealable] *In re Candy S.* (1985) 176 Cal.App.3d 329, 330-331 [222 Cal.Rptr. 43]; *In re Lisa M.* (1986) 177 Cal.App.3d 915 [225 Cal.Rptr. 7]; *In re Debra M.* (1987) 189 Cal.App.3d 1032, 1036-1039 [234 Cal.Rptr. 739]

[such orders not appealable]), the parties have not cited, nor have we found any case discussing the issue of whether a permanency planning order for long-term foster care is appealable.

The concerns which prompted some appellate courts to determine reference orders nonappealable, however—that termination proceedings might never be commenced, or might be unsuccessful, therefore parents were not "aggrieved" by such orders (Code Civ. Proc., § 902)—do not apply here. An order making a permanent plan for a child other than adoption presupposes a determination that there is no substantial probability a child will be returned to his or her parents within the next six months (Welf. & Inst. Code, § 366.25, subd. (d)), and also ends mandatory reunification services (Welf. & Inst. Code, § 361.5, subd. (a); Cal. Rules of Court, rule 1377(g)(1).)

In addition, unlike "reference" orders, there is no further, separate appealable order or judgment, such as a judgment terminating parental rights, resulting from an order for long-term foster care, which would justify the delay in an appellate court's review of this permanent plan. The children continue as dependents of the juvenile court until the conditions justifying their dependency no longer exist, and permanency planning review hearings are continued at six-month intervals as long as the children remain dependents of the juvenile court (former Welf. & Inst. Code, § 366.3, subd. (c).) Each of these subsequent hearings results in an order which is, arguably, appealable (Welf. & Inst. Code, § 395; Cal. Rules of Court, rule 1396(b).) To decline review of the permanent plan ordered by the court for these children at this juncture would thus have the effect of encouraging multiple appeals, or of unjustifiably delaying review of the permanent plan. We thus conclude that we have jurisdiction to review such an order.

■ We note that this conclusion is in accord with the newly enacted Welfare and Institutions Code section 366.25, subdivision (j), added by chapter 1075, Statutes 1988. This subdivision states, "An order by the court that authorizes the filing of a petition to terminate parental rights pursuant to Section 232 or that authorizes the initiation of guardianship proceedings is not an appealable order but may be the subject of review by extraordinary writ." Under the maxim *expressio unius est exclusio alterius*, subdivision (j)'s failure to mention other possible orders, including orders for long-term foster care, indicates the Legislature's intent not to preclude appeals from such orders. (2A Sutherland, Statutory Construction (1972) § 47.23; *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744].)

Although Welfare and Institutions Code section 366.25, subdivision (j) was not effective until January 1, 1989, section 366.25, subdivision (i),

which applies all the provisions of section 366.25 to minors adjudged dependents of the juvenile court prior to January 1, 1989, makes subdivision (j) applicable to cases such as that before us, where a permanency planning order was in place before the effective date of the statute. (See also *In re T.M.* (1988) 206 Cal.App.3d 314, 316 [253 Cal.Rptr. 535].)[1]

Appellants' next argument pertains to the court's decision, at the February 4, 1988, permanency planning hearing, not to extend further reunification services to them. They suggest that the services they received were inadequate, that the court could not have found they were adequate, and that they should have had a further opportunity to receive services in view of their inadequacy. In order to evaluate this claim, we review the services offered appellants.

Prior to the jurisdictional hearing in November 1985, appellants and their two children had been evaluated by a team consisting of a physician, a psychiatric social worker and a legal consultant. This evaluation documented appellants' problems in raising the children, including both children's failure to thrive and the sexual abuse of Corienna by the father, and the preventive services which had been unsuccessful in solving these difficulties before the children were removed to a foster home in April 1985. It also expressed concern that the mother might not be able to master the homemaking and parenting skills which she lacked.

After the dispositional hearing in January 1986, appellants attended therapy groups at Parents United on a weekly basis. They also regularly attended parenting classes. To address the need to help appellants manage their meager finances, their case worker also gave the mother a referral for financial counseling, and she received advice from Consumer Credit Counselors about how to budget and how to prioritize spending. By November 1986, appellants had been terminated from Parents United because they continued to deny having molested Corienna. They were then referred to the Overton Foundation for a psychological evaluation. The mother was

---

[1] We agree that the Legislature intended to make subdivision (j) applicable retroactively to "reference" orders from permanency planning hearings which predated the effective date of its enactment, although we disagree with *T.M.* that this conclusion is authorized by the presence of present subdivision (i). That subsection states: "This section applies to minors adjudged dependent children of the juvenile court pursuant to subdivision (c) of [former] Section 360 [allowing a court to adjudge a minor dependent or order services after a dispositional hearing] prior to January 1, 1989." Since subdivision (i) was amended by chapter 1608, section 6, Statutes 1984, four years prior to the enactment of subdivision (j), we are not entirely persuaded by this logic. More persuasive is subdivision (j)'s reference to section 232 of the Civil Code. After January 1, 1989, terminations of parental rights no longer take place under this section but under section 366.26 of the Welfare and Institutions Code. We believe this reference indicates the Legislature's intent to make the statute applicable to dependency cases adjudicated prior to January 1, 1989.

evaluated as "passive . . . childlike, naive and mentally simplistic in her thinking." Appellants proceeded to see an adult and child guidance therapist on a weekly basis for the next year.

The social worker also gave the mother, who had a sporadic employment history, a referral for the Department of Rehabilitation in November 1986 for an evaluation and employment services. In April 1987, appellants started a new parenting class at the Adult and Child Guidance Clinic. In November 1987, another psychological evaluation of appellants and the two children was performed by a licensed clinical psychologist. In February 1988, the social worker also referred the mother to the public health nurse for assistance with basic meal planning and nutrition.

Appellants also had liberal visitation with the children. Initially, the father was excluded from visitation under a no-contact order, but he started visiting the children in the foster home in November 1986. Appellants were accorded increasingly liberal visitation until July 1987, when they took the children to Utah without court permission. After that time, visitation was again supervised. In February 1988, when the trial court expressed its concern that the reunification plan had failed to address the father's failure to confront his sexual abuse of Corienna, it ordered a neurological evaluation of the mother, an evaluation of the father's ability to confront his sexual abuse, and an evaluation of "all possible relative homes for long and/or short term care."

The neurological assessment of the mother reported that she had borderline retardation and mild neurological deficits. In the neurologist's opinion, this did not affect her parenting ability, and the decision whether to return her children to her custody should depend "on the history of previous behavior and the psychiatric evaluation."

The evaluation of appellants by a licensed psychologist reported that the mother was an "intellectually limited woman who functions within the low-average to borderline level of intelligence. . . . [H]er everyday functioning as shown by her past history indicates that she is quite limited in her life-management skills." As to the father, the psychologist reported that "[t]he likelihood that within the foreseeable future he would admit to having sexually abused his daughter is almost nonexistent."

After reviewing these reports, the trial court commented: "[I]t sounds to me like regardless of fits and starts in the reunification effort in the past, which I was critical and others have been critical of, the fact is that a support network has been basically in operation the entire two years or so, or however old this case is, and continues to be basically in operation, and

my impression of [the] parents is that they are going to need support networks on a permanent basis probably." The court then stated its agreement with the social worker's recommendation not to return the children home, and ordered that they be placed in a suitable relative or foster home.

On this record, we reject appellants' contentions that they were provided inadequate reunification services and that the court could not have found that the services they received were adequate. On the contrary, a plethora of appropriate services was provided appellants for over two years even though no services were mandated in light of the sexual abuse against Corienna (Welf. & Inst. Code, § 361.5, subd. (b)(3).) Despite all these services, and despite appellants' best efforts, substantial problems continued to prevent the children's return home. No blame for this result can properly be attributed to a lack of adequate reunification services, however.

As to appellants' contention that the court should have continued to offer appellants reunification services beyond the February 4, 1988, permanency planning hearing, we agree with respondent that such services are not mandated (see Welf. & Inst. Code, § 361.5, subd. (a); Cal. Rules of Court, rule 1377(g)(1), and *post*). As respondent county counsel points out, it is open to question whether a court has discretion to order further reunification services after 18 months. (See, e.g., *In re Michael S.* (1987) 188 Cal.App.3d 1448, 1461, fn. 4 [234 Cal.Rptr. 84].) ▮ Nonetheless, since the court in this case was advised by county counsel that it had the discretion to order an additional period of reunification if it found some error during the reunification period, we proceed to determine whether it was a proper exercise of the court's discretion to deny appellants' request for further services on this record.

We have already reviewed the history of the extensive reunification services offered appellants. We have noted the fact that the judge presiding over the February 1988 permanency planning hearing was concerned that the father had not been confronted with the sexual abuse of his daughter. It is evident from the record that the court was considering ordering further reunification services for appellants in view of this deficit, but decided against such a step after reviewing the neurological and psychological evaluations it ordered completed in order to make that decision, including the February 1988 psychologist report stating the unlikelihood of the father's admitting that he had sexually abused his daughter.

Appellants were afforded preplacement preventive services for two years prior to the children's removal to foster care in April 1985. Reunification services were also extended from February 1986 to February 1988. Despite this, serious concerns remained about appellants' ability to adequately care

for the children. In light of the extent and duration of the reunification services afforded appellants, and of the almost three years the children had been in emergency foster care by this time, it was entirely reasonable for the trial court to refuse to extend further reunification services to appellants.

Appellants also complain that the trial court did not consider placing the children with their maternal grandparents, who had been afforded and had exercised visitation rights since the case was transferred to Santa Clara County. They rely on Welfare and Insitutions Code section 361.3, subdivision (a) which mandates that preferential consideration be given to a relative home placement for children who are removed from their parents' physical custody. We proceed to examine the record to determine in what fashion relative placements were considered by the trial court.

The social worker testified at the February 4, 1988, hearing that she had asked appellants to give her information regarding relatives who might be possible placements for the children and had received no responses, despite having written both to appellants and to their attorney, except for the suggestion of a family in Oregon. The social worker proceeded to follow up on this placement referral before the March 1988 hearing. She also followed up on a relative referral in Placerville. On March 2, the social worker asked the mother for more referrals, and she provided three additional possible relative placement suggestions.

As to the maternal grandparents, the social worker testified at the February 1988 hearing that she would like to consider the grandparents and evaluate them as a possible placement, but she did not know if they would be agreeable to such a placement. When county counsel asked the maternal grandfather at this hearing whether he had offered his home as a placement for the children, he indicated that he had. When asked if the offer was still good, however, the mother's counsel objected. Since there is no mention of the maternal grandparents in the March 7, 1988, social report, it is unclear whether the grandparents' home was still available as a placement option at this time.

It is evident from the record of the March 7 hearing that county counsel and counsel for the children, as well as the court, concurred with the social worker's recommendation that the optimum permanent placement for these children in view both of the failure of reunification efforts and of the continuing bond between parents and children, would be in a relative home. At the close of this hearing, the court ordered appellants, inter alia, to "provide D.S.S. with and cooperate with any relative home placement referrals if there are any in the future."

We are satisfied, after reviewing the record, that the court complied with the statutory requirement to give preferential consideration to a relative home placement for these children. We sincerely hope that such a placement has been found in the past year, and that these children are finally in a secure and permanent home.

■    Last, appellants argue that the case must be remanded because the court failed to make a determination required by Welfare and Institutions Code, section 366.25, subdivision (d). This subdivision provides in part: "If the court determines that the minor cannot be returned to the physical custody of his or her parent or guardian and that there is not a substantial probability that the minor will be returned within six months, the court shall develop a permanent plan for the minor. . . ." The determination is made under Welfare and Institutions Code section 366.25, subdivision (c). (See also Cal. Rules of Court, rule 1379(c)(2).) Appellants are correct that no express determination appears in the reporter's transcript of either the second permanency planning hearing in February 1988, of the continued hearing in March 1988, or in the minute orders memorializing these hearings. We conclude, however, that such a determination can properly be implied on the record before us.

Respondent counsel for the children suggests that this requirement applies only to the 12-month review and permanency planning hearing. We agree that the language of Welfare and Institutions Code section 366.25, subdivision (c) is equivocal, since both the 12-month review hearing, and all subsequent hearings are termed "permanency planning hearings" or "permanency planning review hearings." Permanency planning can only be delayed beyond a 12-month hearing, however, when a court makes a determination that a substantial probability exists that the child will be returned to his or her parents' custody within the next 6 months. The statute clearly demands that a court make a contrary determination as a prerequisite to changing the focus of the proceedings from reunification of children with their parents to making an alternative permanent plan for such children. The court failed to make that express determination here.

Appellants argue that we should reverse and remand for the trial court to make this determination. While we agree that the better practice would have been for the trial court to have made a required determination on the record, we perceive no practical purpose which would be achieved by such a result. This is not a case, like *In re B.J.B.* (1986) 185 Cal.App.3d 1201, 1211 [230 Cal.Rptr. 332], where the trial court expressly refused to make such a finding. Nor is it akin to *In re R.S.* (1985) 167 Cal.App.3d 946, 961 [213

Cal.Rptr. 690] where a trial court could not have made such a determination on the record. Substantial evidence would amply have supported such a determination here. (*In re Angelia P.* (1981) 28 Cal.3d 908, 924 [171 Cal.Rptr. 637, 623 P.2d 198].)

Nor are we compelled to reverse because the lack of an express determination prejudiced appellants in any way. (*In re B.G.* (1974) 11 Cal.3d 679, 699 [114 Cal.Rptr. 444, 523 P.2d 244].) In order to provide stable, permanent homes for children who cannot be returned home, Welfare and Institutions Code section 366.25, subdivision (a) mandates that courts conduct permanency planning hearings to make "a determination regarding the future status of the minor no later than 12 months after the original dispositional hearing . . . and in no case later than 18 months from the time of the minor's original placement . . . ." In December 1986, when the 12-month review and first permanency planning hearing in this case took place, the court made a finding, based on the social worker's positive report concerning appellants' progress toward reunification, that there was a substantial probability that the children would be returned to their parents' custody within 6 months. It therefore extended reunification services for an additional six months and set another review hearing for six months later. The statute mandates that this later review "shall be a permanency planning hearing." There is no provision in the statutes for any permissible further delay in making a permanent plan for a dependent child. At a second, 18-month permanency planning hearing, a court must thus either order children returned to their parents' custody or, if reunification efforts have failed, make an alternative permanent plan for them.

The second permanency planning hearing was originally scheduled for May 1987, more than two years after the children were first removed from appellants' custody and thus more than six months after the statutory limit on the prepermanency planning period. At that time it appeared that the recommendation would be that the children be returned home under supervision. The hearing was delayed, however, because appellants removed the children to Utah and because the social worker changed her recommendation from returning the children home to a permanent plan of long-term foster care. By February 1988, when the hearing took place, almost 25 months had elapsed since the dispositional hearing, and it was more than 3 years since the children were first taken into protective custody. Appellants knew that at this second hearing the recommendation would not be that the children be returned to their custody, but instead would be for long-term foster care. They do not, and could not, claim they were unaware that the subject of the February 1988 hearing was to make a permanent plan for their children. Since appellants were not prejudiced by the lack of an ex-

press determination, and since this determination can be implied on this record, we will affirm the permanency planning order.

The order is affirmed.

Agliano, P. J., and Cottle, J., concurred.